**NATIONAL ELECTRICAL MANUFACTURING ASSOCIATION et al., Plaintiffs,**

**v.**

**UNITED STATES of America and Interstate Commerce Commission, Defendants,**

**and**

**Aberdeen and Rockfish Railroad Company, et al., Intervening Defendants.**

**Civ. A. No. 75–249.**

United States District Court,
W. D. Pennsylvania.

Jan. 30, 1976.

Samuel P. Delisi, Pittsburgh, Pa., for plaintiffs.

Raymond M. Ripple, Washington, D. C., for I.C.C. Richard L. Thornburgh, U. S. Atty., for defendants.

Robert Szwajkos, Philadelphia, Pa., for intervening defendants.

Before WEIS, Circuit Judge, and KNOX and SNYDER, District Judges.

## OPINION

KNOX, District Judge.

The plaintiff National Electrical Manufacturers Association (NEMA) and four of its members bring this action to set aside a decision and order of the Interstate Commerce Commission (Commission) upholding railroad rates for transportation of heavy electrical equipment. See 349 I.C.C. 502, Docket No. 35,380. This action was brought against the United States as defendant pursuant to 28 U.S.C. § 2322, and the Commission has appeared as a defendant pursuant to 28 U.S.C. § 2323. The railroads also are defendants in this action, being permitted to intervene under 28 U.S.C. § 2323.

The plaintiffs, other than NEMA, are manufacturers of transformers, generators, turbines, motors and related apparatus, which they ship from various

points in the East and South to destinations throughout the United States. This suit involves the applicable rates for equipment of this type that exceeds 75,000 pounds per unit in weight, and which in some cases exceeds 300,000 pounds per unit.[1] Because of the large size and weight of this equipment, the use of heavy capacity and special type railroad cars is required. The exceptionally heavy equipment is transported on special flatcars furnished by the shippers.

■ This action is an appeal from the finding of the Commission in No. 35,380, *NEMA, et al v. Aberdeen and Rockfish Railroad Company, et al*, that the assailed rates were not shown to be unjust and unreasonable in violation of § 1(5) of Title 49. These plaintiffs, as well as other shippers not a party to this proceeding, had sought reparations for excessive charges and the prescription of lower rates for the future. The Commission denied relief. Plaintiffs, before the Commission and in this proceeding, have assailed the present railroad rates for transportation of this heavy electrical equipment as unreasonably high, both relative to other commodities and *per se*, as bearing a disproportionate and unreasonable share of the transportation burden. They also assail the allowance of

four cents per mile for the use of shipper-owned cars as unreasonably low and seek, instead, a reduced rate for those shipments with no mileage allowance. In this appeal from the decision and order of the Commission, this three-judge district court[2] was convened in accordance with the provisions of 28 U.S.C. §§ 1336, 2284, and 2321–2325.[3]

■ The scope of review of decisions of the Interstate Commerce Commission is well established, and little exposition is needed here. In *Atchison, T. & S. F. R. Co. v. Wichita Board of Trade*, 412 U.S. 800, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973), the Supreme Court stated:

"Judicial review of decisions by the Interstate Commerce Commission in rate cases necessarily has a limited scope. Such decisions 'are not to be disturbed by the courts except upon a showing that they are unsupported by evidence, were made without a hearing, exceed constitutional limits, or for some other reason amount to an abuse of power'. *Manufacturers R. Co. v. United States*, 246 U.S. 457, 481 [38 S.Ct. 383, 389] [62 L.Ed. 831] (1918). As this court has observed, 'The process of rate making is essentially empiric. The stuff of the process is fluid and changing—the re-

---

1. Paragraph No. 4 of the Complaint before the Commission states that the assailed rates "generally reflect Class 38, minimum 30,000 pounds, under Docket 28,300 within Eastern Territory and Class 45, minimum 30,000 pounds, under the Uniform Freight Classification intraterritorially [sic] and interterritorially [sic]". Complainants sought prescription of rates on the commodities in question based on (1) Class 30, minimum 75,000 pounds, under Docket 28,300 on shipments utilizing railroad-owned or supplied equipment, and (2) Class 22.5, minimum 75,000 pounds, under Docket 28,300 on shipments moving on shipper-owned or supplied equipment (with no separate mileage allowance) for application within and between all rate territories except Transcontinental.

2. In *United States v. I.C.C.*, 337 U.S. 426, 69 S.Ct. 1410, 93 L.Ed. 1451 (1949), the court held that suits for reparations, whether granted or denied by the Commission, are to be reviewed by one judge, rather than a three-judge panel. However, analysis of this case and the case of

*I.C.C. v. Atlantic Coastline R. Co.*, 383 U.S. 576, 86 S.Ct. 1000, 16 L.Ed.2d 109 (1966), clearly indicates that a three-judge court is to be convened where the suit seeks an injunction against rates alleged to be excessive and applicable in the present and future, as is the case here, in addition to a claim for reparations which is relatively minor and not pressed.

3. This appears to be the last time the procedure followed in this case will be invoked. Public Law 93–584, approved January 2, 1975, repeals § 2325 and amends § 2321 of Title 28 to provide that "a proceeding to enjoin or suspend, in whole or in part, a rule, regulation, or order of the Interstate Commerce Commission shall be brought in the court of appeals . . . ." Under Section 10 of this Act, that procedure does not apply as to any action "commenced on or before the last day of the first month beginning after the date of enactment." This suit, filed February 27, 1975, meets this deadline with but one day to spare.

sultant of factors that must be valued as well as weighed. Congress has therefore delegated the enforcement of transportation policy to a permanent expert body and has charged it with the duty of being responsive to the dynamic character of transportation problems.' *Board of Trade of Kansas City v. United States*, 314 U.S. 534, 546 [62 S.Ct. 366, 372] [86 L.Ed. 432] (1942)." [Footnote omitted].

In *United States v. Pierce Auto Freight Lines*, 327 U.S. 515, 66 S.Ct. 687, 90 L.Ed. 821 (1946), we are told:

"[The function of the reviewing court] is limited to ascertaining whether there is warrant in the law and the facts for what the Commission has done. Unless in some specific respect there has been prejudicial departure from requirements of the law or abuse of the Commission's discretion, the reviewing court is without authority to intervene. It cannot substitute its own view concerning what should be done . . . for the Commission's judgment upon matters committed to its determination, if that has support in the record and the applicable law."

██ The test is whether the Commission's action is supported by substantial evidence on the record considered as a whole. 5 U.S.C. § 706; *Consolo v. Federal Maritime Com.*, 383 U.S. 607, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966).

## I. SHIPPING RATES USING RAILROAD–SUPPLIED CARS.

About ninety per cent or more of the shipments we are concerned with in this case are transported on railroad-owned equipment. In general, however, the heaviest and most bulky items are transported on shipper-owned cars. Of the studied 1,616 shipments in the year 1968, the 1,550 shipments which moved in railroad-owned cars weighed an average of 136,798 pounds per car, while the remaining 66 shipments transported in shipper-owned cars averaged 459,294 pounds per car. The railroads have a substantial investment in cars for transporting heavy electrical equipment, and because of this equipment's excessive weight and large dimensions, it requires special handling procedures and services as will be further described below. For further elucidation of the problems of these commodities which require circuitous routing, see the learned opinion of Judge Dumbauld in *Westinghouse Electric Corp. v. United States*, 388 F.Supp. 1309 (W.D.Pa.1975).

Plaintiffs contend that the high freight rates applicable to their shipments of electrical equipment result from the simple fact that they are "captive" traffic of the defendant railroads, other means of transportation being impractical. Plaintiffs' evidence assailed the shipping rates in two ways. First, they compared the rates on other selected commodities. Secondly, they showed the relationship of rail revenues produced from the commodities in question to the "fully allocated costs" attributed to this traffic. The Commission rejected both of these analyses.

As to the comparison with other commodities, the Commission found the evidence unpersuasive. They found the compared commodities where also durable, manufactured goods having a predominant origin in the Eastern territory, but that otherwise they were not comparable. The Commission further concluded:

"There is no showing that each of the compared commodities have any transportation characteristics in common with complainant's heavy electrical machinery which, because of excessive dimensions in weight, necessitates (a) the use of special flatcar equipment, (b) extra rail services involving clearances of routes, inspection of freight after loading and between rail interline to insure continued clearances, (c) circuitous rail routing resulting from clearance problems, (d) reduced speed in transit to preclude shifting and damage to lading, (e) individual switching as opposed to normal "hump" switching to eliminate impact and thus preclude damage to freight, (f) slow turnaround and low car utili-

zation of special equipment account lack of volume in movement of complainant's high valued commodities, (g) the abnormally high risk the carriers assume in transporting complainant's products weighing 75,000 pounds or more each, that range in value from $100,000 to $1,500,000 per article as shown in complainant's exhibit No. 3, pages 6–7, and (h) complainant's products by reason of their excessive dimensions and weight are unlike any compared commodities in that they are 100 percent captive to the rail lines and, therefore, cannot benefit from the influence of intermodal rate competition as is the case with the rail rates on the compared commodities."

Plaintiffs also assailed the rates by attempting to show that the ratio of revenues to fully allocated costs was in excess of 200 percent, or in other words, that the revenues attributable to the freight in question exceeded fully allocated costs by 100 percent. Putting aside various problems raised as to how these figures should be computed and what adjustments to the figures were appropriate, the Commission noted the lack of precedent for holding that any specific ratio of revenues to fully allocated costs was unreasonable. The Commission cited contrary authority, however, showing generally that the fact that revenues are substantially above fully allocated costs does not establish that the rates are excessive. As stated by the Commission:

"[H]eretofore the Commission has studiously avoided establishing a principle that rates are deemed unjust and unreasonable per se when either the rates or the revenues and earnings produced therefrom exceed the carrier's fully allocated costs for performing the transportation service by a specified percentage figure. The only indication that the Commission might adopt such a principle of establishing maximum rates related to fully allocated costs are the references in each of the opposing briefs filed herein averring that this is a matter under

consideration in Ex Parte No. 270, Investigation of Railroad Freight Rate Structure which is now pending before the agency.

＊　＊　＊　＊　＊　＊

"This is not to say that the Commission lacks the statutory authority to establish such a principle; the fact is the Commission has employed the same statutory provisions to establish the arithmetical doctrine governing minimum reasonable freight rates, namely rates based on the carriers' variable out-of-pocket costs. Complainants ask the Commission to exercise the same statutory authority and establish an arithmetic basis for fixing the maximum level of freight rates in relation to the carriers' fully allocated costs plus an additional profit to make a reasonable, substantial contribution to the overall transportation burden. *The wisdom of establishing such a new principle of rate-making in light of the present financial condition of the Eastern railroads appears dubious.*" [Emphasis ours.]

The Commission has given full consideration to plaintiffs' evidence of unreasonableness of rates on shipments made on railroad-owned equipment, and the court, after a thorough review of the record, finds the decision of the Commission to be supported by substantial evidence on the record considered as a whole. While the plaintiffs did present a substantial case in support of their position, the Commission in rejecting their claim has carefully analyzed the facts and the applicable rate-making principles. Were this court the factfinder, we might have reached a different conclusion. That is not our function, however, and to overrule the Commission on this question would be to substitute the court's view for the Commission's judgment on a matter entrusted by law to the Commission. This we will not do.

## II. SHIPPING RATES USING SHIPPER–SUPPLIED CARS.

In their complaint before the Commission, plaintiffs sought, in addition to

their request for reduced rates on shipments moved on railroad-owned cars, reduced rates for shipments using shipper-owned cars.[4] Plaintiffs challenged the existing rates as "relatively and per se" unreasonable and asserted that they therefore violated Section 1 of the Interstate Commerce Act. As the intervening defendants (the railroad companies who were the respondents before the Commission) point out, plaintiffs did not specifically allege that the existing mileage allowances were themselves inadequate in violation of § 15(13) of the Interstate Commerce Act.[5] Nevertheless, it is clear that plaintiffs raised the question of whether the rates applicable to shipments using shipper supplied cars were reasonable.

■ There appears to be no rule of practice that allowances for shipper supplied equipment can be made only by invoking § 15(13), and *National Gas Co. v. New York Central R. Co.*, 323 I.C.C. 75 (1963) is an example to the contrary. In *National Gas Co.*, the Commission approved rates for unit trains consisting of coal cars owned by the shipper with the adjustment for the use of the cars built into the rate. See also, *Substituted Service—Piggyback*, 322 I.C.C. 301 (1964). Nor did the Commission in this case rely on that technicality, and in adopting the decision of the administrative law judge, it struck out that portion of his decision so ruling. In any event, courts are not permitted to accept counsel's post hoc rationalizations for agency action, but must judge the propriety of an agency's discretionary order solely by the grounds invoked by the agency. *Securities and Exch. Com. v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995, 1999 (1947).

In the case at bar, the Commission does not give its reasons for not considering plaintiffs' evidence on excessive rates on shipments using shipper-owned cars. The Commission states only that the matter "can only be resolved on a more comprehensive record than available herein". The Commission further states:

"If the existing formula fails to reimburse complainants on a just and reasonable basis for the very expensive rail equipment which they furnish to the railroads for moving their own property, the complainants can on a more comprehensive and probative record obtain Commission sanction for a lawful rate of reimbursement."

From these remarks, it is clear that the Commission has not precluded relief. However, the decision does not explain what evidence is lacking in the present record. In the Commission's brief, but not in their decision itself, plaintiffs' evidence is characterized as "a brief discussion of the total costs of private cars, the alleged depreciation, the present allowance, and a comparison with rates maintained by other railroads in different territories."

Plaintiffs have produced evidence that NEMA members have purchased 24 special purpose rail cars for the transportation of larger shipments, that it was necessary to purchase these cars as the railroads were unwilling to do so, that the

---

4. Specifically, plaintiffs requested the Commission to prescribe rates based on:

"(b) Class 22.5, minimum 75,000 pounds, under Docket 28,300 on shipments utilizing shipper-owned or supplied equipment for application within and between all rate territories (Eastern, Illinois Freight, Southern, Southwestern, and Western) except Trans-Continental. Under the basis here sought, mileage allowances now in effect should not apply when shipments move in shipper-owned or supplied equipment." Complaint before I.C.C., Docket No. 35,380, ¶ 6.

5. Section 15(13) provides: "If the owner of property transported . . . furnishes any instrumentality used therein, the charge and allowance therefore shall be published in tariffs or schedules . . . and shall be no more than just and reasonable, and the Commission may, after hearing on a complaint or on its own initiative, determine what is a reasonable charge as the <u>maximum to be paid by the carrier</u> . . . for the use of the instrumentality so furnished . . . ." (Underscoring ours.)

investment to date is approximately $5,000,000 on a cost basis, and that the replacement cost today would be as much as $500,000 per car, although the average replacement cost would be lower. Plaintiffs further attempted to show that by their estimates in the study year 1968 the pro rata straight-line depreciation of cars used in Docket 28,300 territory was $129,520, but the mileage allowance paid by the railroads equalled only about $9,700. Plaintiffs further demonstrated that as to some published rates in effect by some of the major railroads, the rates on shipments in shipper-owned cars were generally 21 to 22 percent lower than those on railroad-owned cars. Plaintiffs admit that this latter evidence does not impel the prescription of lower rates, but they argue that it is strong evidence that should be considered, simple though it may be. The railroads presented no evidence on these matters, apparently resting on plaintiffs' asserted failure to show unreasonableness.

■ The court agrees with plaintiffs that the Commission has failed to perform its statutory duty. The Commission has summarized plaintiffs' assertions and recognized plaintiffs' investment in expensive equipment, but without stating its reasons, it found the evidence inadequate. The Commission gives no discussion or findings. The evidence is simple, direct, clear and uncontradicted. While the Commission leaves open the possibility of relief on a more comprehensive record, it has not particularized the manner in which the present record is defective. Plaintiffs have presented a substantial case, their evidence has not been contradicted, and the Commission has given no reasons for rejecting their evidence.

If the Commission lacked sufficient data to establish an appropriate rate, they could have required the railroads to present their evidence or requested the plaintiffs to present further material.[6] The Commission's blanket dismissal of the claim on the ground that the record is not comprehensive enough merits little weight when we consider, not only the evidence outlined above pertaining only to shipper-owned cars, but also plaintiffs other evidence pertaining to all shipments of electrical equipment. While we have sustained the Commission's determination of reasonableness as to shipments on railroad equipment, that evidence clearly showed that the railroads received very ample compensation on such shipments. Although we could not say the Commission erred in approving those rates, it seems apparent that those rates approach the upper range of the "zone of reasonableness" described in *United States v. Chicago M. St. P. & P. R. Co.,* 294 U.S. 499, 55 S.Ct. 462, 79 L.Ed. 1023 (1935). Surely this evidence has some bearing on the determination of a reasonable rate when shipper-owned cars are used. It may be that the inadequate mileage allowance, when coupled with the high though reasonable rates applicable when railroad-owned cars are used, is the coup de grace. To require plaintiffs to repeat this evidence in a separate "more comprehensive" proceeding, while dismissing the present evidence as insufficiently probative, is an abuse of discretion.[7]

We note the applicability of the language in *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 167, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962) to the case at bar:

"There are no findings and no analysis here to justify the choice made, no indication of the basis on which the Commission exercised its expert discretion. We are not prepared to and the

---

6. We do not, of course, suggest a departure from the rule in proceedings of this kind that the burden of proof is on the shipper to show that the rate at issue is unreasonable. *Atchison T. & S. F. R. Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 93 S.Ct. 2367, 37 L.Ed.2d 359 (1973); *Potomac Passengers Assoc. v. U. S.* (D.C.1975) (No. 74–412, decided Sept. 30, 1975.)

7. We neither endorse nor reject plaintiffs method of proving unreasonableness, and it may be that in a proceeding limited to the question of the appropriate rate when shipper-owned cars are used, plaintiff would present his case best in some other manner.

Administrative Procedure Act will not permit us to accept such adjudicatory practice. See *Jacob Siegel Co. v. Federal Trade Comm'n,* 327 U.S. 608, 613–614 [66 S.Ct. 758, 90 L.Ed. 888]. Expert discretion is the life-blood of the administrative process, but 'unless we make the requirements for administrative action strict and demanding, expertise, the strength of modern government, can become a monster which rules with no practical limits on its discretion.' *New York v. United States,* 342 U.S. 882, 884 [72 S.Ct. 152, 96 L.Ed. 662] (dissenting opinion) . . . The Commission . . . must 'disclose the basis of its order' and 'give clear indication that it has exercised the discretion with which Congress has empowered it.' *Phelps Dodge Corp. v. National Labor Relations Board,* 313 U.S. 177, 197 [61 S.Ct. 845, 85 L.Ed. 1271]. The agency must make findings that support its decision, and those findings must be supported by substantial evidence."

The court finds authority to remand this question to the Commission under both § 706(1) and § 706(2)(A) of the Administrative Procedure Act. The former authorizes the reviewing court to compel agency action "unlawfully withheld or unreasonably delayed", and the latter directs us to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law". An appropriate order will be entered.

### ORDER

And now, to wit, January, 1976, plaintiffs' counsel is directed to submit to the Court within ten (10) days a proposed order in accordance with the foregoing opinion with notice given to counsel for the other parties.