GENSTAR CHEMICAL LIMITED,
Plaintiff,

v.

INTERSTATE COMMERCE
COMMISSION, Defendant.

Civ. A. No. 80–101.

United States District Court,
District of Columbia.

May 30, 1980.

William Q. Keenan, New York City, Gordon P. MacDougall, Washington, D. C., for plaintiff; Arsham & Keenan, New York City, of counsel.

Richard A. Allen, Washington, D. C., General Counsel, I. C. C., Whitney Adams, Asst. U. S. Atty., Civ. Div., Washington, D. C., for defendant.

### MEMORANDUM OPINION

FLANNERY, District Judge.

*Introduction*

This is a petition for review of an order by the Interstate Commerce Commission (ICC or Commission) respecting the plaintiff's claim against some thirty railroads for approximately $200,000.00. The plaintiff, Genstar Chemical Ltd. (Genstar) seeks that amount in overcharges for shipments between the Eastern United States and Canada, and the ICC awarded it only a fraction of that amount at the administrative level. This case raises two basic issues: (1) does jurisdiction over this dispute reside in the district court or the court of appeals? and (2) is the plaintiff entitled to a complete or only partial refund of the admittedly excessive rate increase applied to its shipments in the period in question? Both sides have moved for summary judgment.

The court is persuaded that it does have jurisdiction over this dispute and that Genstar is entitled to a refund of the entire increase for the period in question.

*Background*

The origins of this case go back to 1971, when the ICC approved a general rate increase for railroad shipments: 14% for domestic traffic and 12% for import-export traffic. Ex Parte No. 267. Pursuant to a tariff labelled X–267–B, the railroads immediately began charging 14% on shipments between Canada and the Eastern United States, and they continued doing so until 1977, when the Supreme Court ruled that the 12% limit on import-export traffic em-

braced these Canadian-U. S. shipments. *Canadian National Railway Co. v. United States*, 430 U.S. 961, 97 S.Ct. 1638, 52 L.Ed.2d 352 (1977) (affirming *per curiam* 425 F.Supp. 290 (D.D.C.1976)). It is undisputed that Genstar is entitled to at least a 2% refund on shipments between September 13, 1974 and May 6, 1977, the period allowed by the applicable statute of limitations, 49 U.S.C. § 11706(b). Genstar argues, however, that for this 1974–77 period it is entitled to 100% of the difference between the rates in effect before 1971 and those in effect thereafter. That is, it seeks a refund of 14% rather than just 2% for the period in question.[1]

*Discussion*

I. Jurisdiction.

Genstar seeks review in this court under 28 U.S.C. § 1336(a), which provides,

> Except as otherwise provided by Act of Congress, the district courts shall have jurisdiction of any civil action to enforce, in whole or in part, any order of the Interstate Commerce Commission, and to enjoin or suspend, in whole or in part, any order of the Interstate Commerce Commission *for the payment of money or the collection of fines, penalties, and forfeitures.*

(Emphasis supplied.) The railroads and the ICC contend that under 28 U.S.C. §§ 2321(a) and 2342, the ICC's order is reviewable only in a court of appeals. These sections provide as follows:

> 28 U.S.C. § 2321(a)—Except as otherwise provided by an Act of Congress, a proceeding to enjoin or suspend, in whole or in part, a rule, regulation, or order of the Interstate Commerce Commission shall be brought in court of appeals as provided by and in the manner prescribed . . . .

> 28 U.S.C. § 2342—The court of appeals has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to

---

1. The intervening railroads raise a secondary issue regarding precisely what rates were in effect before 1971, when Ex parte No. 267 took effect. The ICC does not address this issue, however, and the court is persuaded that that problem, if indeed it is a problem, may suitably be resolved at a later date.

determine the validity of—. . . all rules, regulations, or final orders of the Interstate Commerce Commission made reviewable by section 2321 of this title. Clearly, the issue turns on application of the emphasized language in section 1336(a), namely, whether this order is one "for the payment of money."

In arguing for a narrow construction of this language, the ICC makes three points. First, it emphasizes that district court review is exceptional, *i. e.,* that review is presumptively with the courts of appeals. This effort to place a burden of proof on the plaintiff lacks case law support, however, and in any event deserves minimal weight. Second, the ICC argues that because courts of appeals conduct *de novo* review of the administrative record when reviewing district court rulings in such cases, acceptance of jurisdiction by the district court creates a potential for needless duplication of effort. Although the premise of this argument is technically accurate, its conclusion is unconvincing. It assumes that district court review is gratuitous. Congress manifestly intended to provide the courts of appeals with the benefit of district court review in some cases, thereby easing the burden on the courts of appeals and providing the parties an opportunity to appeal short of going all the way to the Supreme Court. Although district courts should be wary of overstepping their jurisdiction, they should be equally wary of rejecting a burden that Congress intended to locate there. Third, the ICC argues that simply because there are more district courts than courts of appeals, acceptance of jurisdiction by the district court increases the potential for conflict among the courts. Like the preceding point, this argument is technically accurate but unpersuasive.

More fruitful analysis involves the purpose of the statute and the cases applying it.[2] A central precedent is *United States v. I. C. C.,* 337 U.S. 426, 442, 69 S.Ct. 1410, 1419, 93 L.Ed. 1451 (1949), in which the Supreme Court stated with regard to "Commission orders for the payment of money" that they "are not likely to be of *sufficient public importance* to justify use of the three-judge procedure." (Emphasis supplied.) Focusing on this language, the ICC argues that the present case is of sufficient public importance to justify the present equivalent of the three-judge court, namely, review in the court of appeals. The ICC also makes much of the Court's following statement with regard to the Commerce Court, whose jurisdiction was later transferred to the three-judge district courts:

> The purpose of creating the Commerce Court with such direct appeals [to the Supreme Court] was expedition of final determination of the validity of certain types of Commission orders. This expedition was sought for orders *of national or widespread interest,* such, for example, as railroad rate orders.

(Emphasis supplied.) Parties challenging Commission orders in the courts of appeals no longer may appeal as of right to the Supreme Court, but to the extent that the jurisdiction originally with the Commerce Court is now with the courts of appeals, this language regarding "national or widespread interest" is still germane.

The ICC would have the court hold simply that the present orders are of widespread interest and therefore that review should be in the court of appeals. Its test for whether an order is of widespread interest is whether it "will likely affect more than just the specific parties to the litigation or where the relief sought goes beyond

---

**2.** In analyzing these precedents it is important to note that before 1975 the jurisdiction presently with the courts of appeals resided with three-judge district courts, from which appeals were to proceed directly to the Supreme Court. *See United States v. ICC,* 337 U.S. 426, 442, 69 S.Ct. 1410, 1419, 93 L.Ed. 1451 (1949); *Aluminum Co. of America v. ICC* (Alcoa ), 553 F.2d 1268 (D.C.Cir.1977). *As the court stated in* Alcoa, *id. at 1270, "[T]he statutory exception to*

*the Court of Appeals' jurisdiction to review such [ICC] orders [namely, the exception for orders for "the payment of money,"] tracks the old exception to review by three-judge District Courts," and nothing in the legislative history suggests Congress intended by the shift of jurisdiction to alter the scope of the exception. Hence, pre-1975 cases addressing the exception are as illuminating as similar cases arising thereafter.*

a mere money payment." Defendants' Memorandum 11.

This analysis of *United States v. ICC*, like the government's analysis of the other cases discussed below, is untenable. In particular, although the second part simply restates the statute, the first part is narrower than the cases would justify. In *United States v. ICC*, for example, the United States, suing as a shipper, challenged ICC orders denying its request for reparations from railroads allegedly guilty of unlawful exactions. The Court held that review was properly before the one-judge district court. Although the Court's treatment of this issue was limited, its example of an order of "national or widespread interest"—railroad rate orders, 69 S.Ct. at 1419—supports a test that inquires whether the order in question would have prospective or only retroactive effects. To apply the Court's own example, railroad rate orders manifestly would have prospective effects, so they constitute more than an order for the payment of money.

Several other cases cited by the parties support such prospective/retrospective effect analysis. In *Island Creek Coal Sales Co. v. ICC*, 561 F.2d 1219 (6th Cir. 1977), the court held that review of the ICC order in dispute was properly with the court of appeals. The order, according to the court, "doubled the demurrage charges[3] for coal cars and altered the method for computing demurrage credits." *Id.* at 1220. Accepting the case for review, the court stated,

> Petitioners are seeking more than mere reparations from railroads to which they paid allegedly excessive demurrage charges. They ask for more than money. They challenge the fundamental power of the Commission to issue [this] Order . . . and the method used to promulgate the demurrage increases. Seeking refund of the charges paid pursuant to the Commis-

sion's order is collateral to the attack upon the order itself. *Id.* at 1222.[4]

Similarly, in *Aluminum Co. of America v. ICC (Alcoa)*, 553 F.2d 1268 (D.C.Cir.1977), the U. S. Court of Appeals for the District of Columbia upheld the jurisdiction of the one-judge district court over an ICC order regarding "a refund of alleged overcharges on certain rail car switching movements." *Id.* at 1268. The opinion stated, "Unlike other ICC orders, payment orders are not 'quasi-legislative orders, in which the public at large are interested. . . .'" *Id.* at 1270. Because "quasi-legislative orders would, like anything legislative, have prospective effects, this language supports the test suggested above.

Attempting to distinguish *Alcoa*, the ICC contends that "[u]nlike the instant case, *Alcoa* did not involve a general rate increase or review of a Commission policy uniformly applied in numerous cases." Defendants' Memorandum 12. But here what the plaintiff challenges is not the general rate increase embodied in Ex Parte No. 267. Rather, its position is that however reasonable and just the general rate increase might have been, no legally effective rate increase ever went into effect respecting Genstar's shipments, and therefore Genstar was overcharged.

Finally, in *Ringsby Truck Lines, Inc. v. United States*, 490 F.2d 620 (9th Cir. 1973), the court addressed an ICC order regarding a complaint that was initially for injunctive relief but that, due to intervening circumstances, became substantively one for monetary relief. The plaintiff first complained in February, 1967 about an ICC rate cancellation order directed at a rate increase then in effect. The complaint went before a three-judge district court, but by the time that court heard the case in 1971, the order in dispute had been superseded by an August, 1967 rate increase. Thus, in the court's words,

---

**3.** "Demurrage is compensation charged by a carrier for undue detention of its equipment." *Island Creek Coal Sales Co. v. ICC*, 561 F.2d at 1220 n.2.

**4.** Under this case, a helpful question would be whether the refund sought is all the plaintiff seeks or whether the refund is "collateral" to other desired relief. Here it appears that Genstar would be satisfied with the refund alone.

[t]he necessity for a three-judge court to provide injunctive relief against the three percent rate cancellation order was therefore obviated and determination of the validity of the ICC order was of practical import only as it related to the restitutionary claim of the shippers for charges previously exacted. The ICC order thus became essentially one for the payment of money and was properly reviewable by a one-judge rather than a three-judge district court.

In *Ringsby*, as in the cases discussed above, the jurisdictional issue appeared to turn on whether the relief sought involved prospective or retrospective relief. *See also National Electrical Mfg. Ass'n v. United States*, 407 F.Supp. 598, 600 n.2 (W.D.Pa. 1976), in which the court commented that analysis of *United States v. ICC* and related case law "clearly indicates that a three-judge court is to be convened where the suit seeks an injunction against rates alleged to be excessive and applicable in the present and future, as is the case here, in addition to a claim for reparations which is relatively minor and not pressed."

▮ Applying this analysis to the case at hand, the court must conclude that the ruling sought by Genstar would have no prospective effects. Genstar seeks nothing more than a fixed sum of money. Thus, the order under consideration falls within the parameters set by the above cases for orders "for the payment of money," and jurisdiction is properly with the district court.[5]

In its effort to portray this case as one of widespread interest, the ICC points out that "[n]umerous shippers sent countless shipments under these tariffs," Defendant's Memorandum 15. It also contends on the basis of its six previous rulings granting shippers only a 2% refund that what Genstar seeks to overturn here is a "uniform

Commission policy." *Id.* With regard to other shippers who made shipments under the tariffs in question, their interest in the outcome of this case does not alter its nature as a suit "for the payment of money." Every decision has precedential effect, and that other similarly situated shippers might seek to take advantage of a ruling for Genstar does not constitute the sort of "widespread interest" to which the Supreme Court was referring in *United States v. ICC*. As for the six ICC rulings that run contrary to the result here, those rulings are hardly binding on this court. Moreover, it appears that in only one of those cases did the shipper argue that it was entitled to a 14% refund, as Genstar argues here.

## II. The Merits.

Genstar's position is that although Ex Parte No. 267 authorized a 12% rate increase on shipments between the U. S. and Canada, in the relevant period no rate increase went lawfully into effect. In support of this position it emphasizes a ruling by the Commission itself, *H. J. Baker & Bros.—Statute of Limitations*, 357 I.C.C. 640 (1978) (en banc). There the ICC was actually addressing a statute of limitations question, namely, which of two possible statutes of limitations applies to suits by shippers seeking refunds for charges in excess of the 12% rate increase allowed by Ex Parte No. 267, the same general rate order involved in the present case. But in the course of resolving this issue the ICC made various statements that bolster Genstar's case substantially.

The opinion states that for four reasons the tariffs filed by the railroads pursuant to Ex Parte No. 267 were not lawful. First, the tariffs "stated charges in excess of those authorized" by Ex Parte No. 267 and subsequent related orders, and therefore

**5.** The plaintiff also makes the potentially self-defeating argument that this case presents the question of whether the ICC, given a rate increase that was entirely invalid at the time of its application to Genstar's shipments, may retroactively, *nunc pro tunc*, grant a 12% rate increase applicable to those same shipments. This, Genstar contends, is what the ICC is

attempting to do here. If this were so, and the issue before the court were the authority of the ICC to take such action, jurisdiction would in all likelihood reside with the court of appeals. The ICC denies that such is its intent, however, and makes no claim that it possesses such authority. Hence the court may properly proceed to the merits of the case.

they were not "lawfully on file." *Id.* at 642. Second, "the tariffs were unlawful because they were filed on less-than-statutory notice." *Id.* The notice requirement appears in 49 U.S.C. § 10762(c)(3), which provides, "A proposed change and a new or reduced rate may not become effective for 30 days after the notice is published, filed, and held open as required under subsections (a) and (b) of this section." Here the railroads acted after only fifteen days' notice, and although they did have "short notice permission" from the Commission, authorized by 49 U.S.C. § 10762(d)(1), this permission embraced only tariffs substantively complying with the limits in Ex Parte No. 267. Third, "the railroads did not give proper notice to the public" by use of the symbols prescribed for rate changes of any sort. *Id.* at 644.[6] Fourth, the Commission stated, "as a policy matter, we cannot allow the railroads to defy our orders and benefit thereby." *Id.*

In response, the railroads emphasize the penultimate sentence of the opinion, which states, "We therefore find that claims for recovery of payments *in excess of those authorized* are overcharges and subject to the 3-year statute of limitations. . . ." (Emphasis supplied.) On the basis of this language they argue that the ICC intended to address only the 2% excess over the 12% authorized increase, but this single passage cannot offset the weight of the aforementioned determinations.

In the Commission's brief treatment of the merits of this case, it makes three points: (1) it would be illogical and unjust to award Genstar more than 2%, because since the Commission authorized the carriers to raise their rates to 12%, only the difference between the 12% and the 14% increase is unlawful; (2) a 2% refund is consistent with the district court's ruling in *Canadian National Railway Co.*; and (3) because of the Commission's expertise the court should defer to it here. Defendant's Memorandum 17–19.

The last of these three points requires little discussion; the deference to which the ICC is entitled is less than controlling, particularly where, as here, the issues call for legal rather than technical expertise. Similarly, the first point requires little discussion, failing as it does to address the plaintiff's argument that for the period in question no rate increase whatsoever came lawfully into effect. As for the second point regarding *Canadian National Railway Co.*, the railroads themselves concede that the case "did not directly consider a retrospective award," Intervenor Railroads' Memorandum 24, and it is clear that the only issue presented there was whether the applicable rate increase was 12% or 14%. Moreover, as the plaintiff argues, that case explicitly adopts the rationale of *Chicago, M., St. P. & P.R. Co. v. Alouette Peat Products (Alouette Peat)*, 253 F.2d 449 (9th Cir. 1957), which the government concedes "supports Genstar's contention. . . ." Defendants' Memorandum 18 n.17. In *Alouette Peat*, 253 F.2d at 456, the court stated,

As to the District Court's direction to the Commission to award to appellees all sums paid in excess of the basic rate, without the 6 cents per hundred increase authorized in Ex Parte 162, it need only be pointed out that the 6 cents per hundred increase . . . had not been, at the time the shipments in question were made, established as the legal rate in the manner provided by law. . . . *A rate once fixed by law remains established until changed in some manner allowed by law.* . . . No change having been legally made in the rate which existed before Ex Parte 162, that rate was the only existing, legally established rate and the Court was bound to apply it.

(Emphasis supplied.) The railroads attempt to show that the "basic thrust" of *Alouette*

---

**6.** 49 C.F.R. § 1300.2(a) now provides, "All tariff publications and supplements thereto must indicate changes thereby made in existing rates or charges . . . by use of the following uniform symbols . . . ."

[teardrop shape] to indicate reductions.
[diamond shape] to denote increases.
[triangle shape] to denote changes in wording which result in neither increases nor reductions in charges.

*Peat* and the ICC's position here are the same, arguing that because the reviewing court in *Alouette Peat* ordered an award and because the ICC here also authorized an award, the outcomes are equivalent. This argument is strained, to say the least.

The railroads make much of the statutory distinction between "legal" and "lawful" rates. As the district court stated in *Canadian National Railway Co.*, 425 F.Supp. at 294–95 n.9,

> When a new carrier-made rate becomes effective, it constitutes the "legal" rate which carriers charge and shippers must pay. A "legal" rate, however, is not necessarily a "lawful" rate for the Commission may, upon investigation, find the rate to be unreasonable or otherwise unlawful.

The main significance of the distinction lies in the possibility of criminal sanctions that may be applied for the payment or collection of "illegal" rates. 49 U.S.C. §§ 10761(a), 11916. The payment or collection of rates determined to be "unlawful," however, may result only in a refund of the amount in question.

The railroads' argument is that here the rates including the full 14% increase were "legal" and therefore properly paid and accepted. But, because of the ICC's determination of the proper rate level in Ex Parte No. 267, only the rates including a 12% increase were "lawful," so the plaintiff is entitled to a refund of that portion of the legal rates that were eventually determined to be unlawful, namely, 2% of the increase.

■ Although superficially plausible, this argument ignores the fact that a rate may be unlawful for reasons other than unreasonableness. As the court said in *Alouette Peat, id.* at 455,

> There is no reason under the [Interstate Commerce] Act why a shipper should not be protected in the situation here existing where the rates are *unlawful because not lawfully established*, just as he is protected in the situation where the rates are unlawful because unreasonable. In either case, the protection is against unlawful rates. Thus under the Act, a rate, to

have final lawfulness and validity, must be *lawfully established* . . ., must be just and reasonable . . . and nondiscriminatory and nonprejudicial . . . .

(Emphasis supplied.) In the present case, it appears that the entire 14% increase was unlawful because not lawfully established.

■ Finally, the railroads argue that to award Genstar the full 14% increase would be to grant Genstar a windfall, with punitive impact on the railroads. The problem with this fairness-based argument is that, aside from the liberties it would have the court take with the statutory scheme, the equities are by no means entirely with the railroads. As the plaintiff observes, the statute of limitations allows recovery of the overcharges for only about half of the period in which overcharges occurred. Moreover, it appears that at least twice the Commission ordered the railroads to cease charging more than a 12% increase on the U. S.-Canadian traffic. *See H. J. Baker & Bros.*, 357 I.C.C. at 640–41:

> The Commission clarified and interpreted Ex Parte No. 267 by orders dated August 6, 1973, and October 5, 1973 stating that all traffic moving between Canada and the United States is export-import traffic and ordered the railroads to cease and desist from charging rates on this traffic in excess of the authorization.

For the foregoing reasons, the court is persuaded that Genstar must prevail in this action. An appropriate Judgment accompanies this Memorandum Opinion.

### JUDGMENT

This matter came before the court on the parties' cross-motions for summary judgment. After consideration of all the arguments put forth by the parties in their briefs and at the hearing, and for the reasons in the accompanying Memorandum Opinion, it is, by the court, this 30th day of May, 1980,

ORDERED, ADJUDGED and DECREED that the plaintiff's motion for summary judgment should be, and the same hereby is, granted; and it is further

ORDERED, ADJUDGED and DECREED that the defendant's motion for summary judgment should be, and the same hereby is, denied.