665 F.2d 1304
 215 U.S.App.D.C. 1
 GENSTAR CHEMICAL LIMITED, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Consolidated Rail Corporation, et al., Intervenors.
GENSTAR CHEMICAL LIMITED
v.
INTERSTATE COMMERCE COMMISSION, et al.,
Consolidated Rail Corporation, et al., Appellants.
GENSTAR CHEMICAL LIMITED
v.
INTERSTATE COMMERCE COMMISSION United States of America, Appellants,
Consolidated Rail Corporation, Norfolk and Western Railway
Company, Chesapeake and Ohio Railway Company,
Baltimore and Ohio Railroad Company,
Western Maryland Railway
Company, Intervenors.
 Nos. 80-1170, 80-1752 and 80-1921.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 15, 1981.
Decided Sept. 25, 1981.
 
 Appeals from the United States District Court for the District of Columbia (D.C. Civil No. 80-0101) and Petition for Review of an Order of the Interstate Commerce Commission.
 Cecilia E. Higgins, Atty., I. C. C., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., Richard A. Allen, Gen. Counsel, and Henri F. Rush, Associate Gen. Counsel, I. C. C., and Royce C. Lamberth, Kenneth M. Raisler and Whitney Adams, Asst. U. S. Attys., Washington, D. C., were on the brief, for I. C. C. and United States of America, appellants in No. 80-1921 and appellees/respondents in Nos. 80-1179 and 80-1752. Sanford M. Litvack, John J. Powers, III, and Robert J. Wiggers, Attys., Dept. of Justice, Washington, D. C., also entered appearances for respondents in No. 80-1179.
 Michael Boudin, Washington, D. C., with whom Theodore Voorhees, Jr., Washington, D. C., and Richard W. Kienle, Roanoke, Va., were on the brief, for Consolidated Rail Corp., et al., appellants in No. 80-1752, appellees in No. 80-1921 and intervenors in No. 80-1179.
 William Q. Keenan for Genstar Chemical Ltd., appellee in Nos. 80-1752 and 80-1921 and petitioner in No. 80-1179.
 Before ROBINSON, Chief Judge, THORNBERRY, Senior Circuit Judge,* and WILKEY, Circuit Judge.
 Opinion for the Court filed by Senior Circuit Judge THORNBERRY.
 THORNBERRY, Senior Circuit Judge:
 
 
 1
 Genstar Chemical Limited filed a claim with the Interstate Commerce Commission against some thirty railroads to recover for alleged overcharges on shipments between the United States and Canada. The Commission awarded Genstar only a fraction of the amount requested. Genstar then filed a petition for review of the Commission order in federal district court as well as a direct review petition in this court. The district court granted Genstar's motion for summary judgment, and the Commission and the railroads appeal. These appeals have been consolidated with the direct review petition. For the reasons that follow, we dismiss the petition for direct review and reverse the judgment of the court below.
 
 I. BACKGROUND
 
 2
 On March 4, 1971, the Interstate Commerce Commission authorized the Eastern railroads to increase their general freight rates for intraterritorial traffic by not more than 14% and for import and export traffic by not more than 12%. Ex Parte No. 267, Increased Freight Rates, 1970 and 1971, 339 I.C.C. 125 (1971). The railroads then published short form Master Tariff X-267-B, increasing overland rates between points in the Eastern territory of the United States and points in Canada by 14%. The Commission relaxed the statutory 30-days notice requirement[1] and allowed the railroads to publish the master tariff on 15-days notice. To make determination and application of the rates approved in the master tariff less awkward and more practical, the railroads subsequently revised and updated their individual commodity rate tariffs to account for the 14% increase. In so doing, the railroads gave the required 30-days notice but did not utilize symbols or otherwise indicate on the commodity tariffs that new rate increases were being proposed.
 
 
 3
 Over the next few years, a dispute arose as to whether the Commission had intended the all-rail traffic between the Eastern territory and Canada to be subject to the 14% increase or to the 12% increase for import-export traffic. Although the railroads traditionally charged the Eastern territory rate for all-rail service between Canada and the Eastern territory, the Commission ultimately concluded that Canadian traffic should be regarded as import-export traffic subject to the 12% increase, and that conclusion was affirmed on review. Canadian National Ry. v. United States, 425 F.Supp. 290 (D.D.C.1976) (three-judge court), aff'd mem., 430 U.S. 961, 97 S.Ct. 1638, 52 L.Ed.2d 352 (1977). In affirming, the court noted that the Ex Parte No. 267 decision did not define the term import-export and that references in the report to seaports and port relationships were ambiguous and confusing. Id. at 296. Numerous shippers then filed complaints with the Commission seeking to recover for their traffic between the Eastern territory and Canada during the period in which the full 14% increase had been in effect. In a series of cases, the Commission uniformly awarded these shippers the 2% difference between the 14% actually charged and the 12% increase intended by the Commission. See, e.g., Ford Motor Co. v. Canadian National Ry., 356 I.C.C. 857 (1977).
 
 
 4
 In December 1978, appellee Genstar Chemical Limited filed a complaint with the Commission seeking an award based on shipments of fertilizer and related products between Canada and the Eastern territory from September 1974 to May 1977. Genstar argued that it was entitled to a refund of not merely the 2% differential but of the entire 14%. An administrative law judge awarded Genstar a 2% recovery, and the Commission's Review Board sustained that determination.
 
 
 5
 Although 28 U.S.C. § 2342 provides the courts of appeals with exclusive jurisdiction to review final orders of the ICC made reviewable by 28 U.S.C. § 2321, Genstar brought suit against the Commission and the United States in federal district court, relying on the narrow exception provided by 28 U.S.C. § 1336(a), which gives the district courts jurisdiction to review ICC orders "for the payment of money ..." and moved for summary judgment. The defendants and the intervening Eastern railroads moved to dismiss on the grounds that court of appeals jurisdiction was exclusive and, alternatively, cross-moved for summary judgment on the merits. Genstar filed a protective direct review petition in this court, proceedings on which were stayed pending the outcome of the district court action.
 
 
 6
 On May 30, 1980, the district court filed its decision holding that it did have jurisdiction and awarding Genstar a full 14% recovery on the theory that the entire 14% increase was unlawful because not lawfully established. Genstar Chemical Ltd. v. ICC, 491 F.Supp. 391 (D.D.C.1980). The government and the railroads filed separate appeals, which were consolidated with Genstar's protective direct review proceeding. The district court has stayed its own decision pending resolution by this court.
 
 II. JURISDICTION
 
 7
 Although we clearly can reach the merits of this controversy, either on appeal from the court below or on direct review, we have held that these two avenues of jurisdiction are mutually exclusive. Aluminum Co. of America v. ICC (Alcoa), 553 F.2d 1268 (D.C.Cir.1977). Thus, we cannot properly dispose of each of these consolidated cases without first determining through which of these paths we derive our jurisdiction. The district court concluded that since Genstar wanted nothing more than a fixed sum of money and since the ruling sought would have no prospective effects, the ICC order at issue was merely one "for the payment of money" and jurisdiction was properly with the district court Genstar, supra, 491 F.Supp. at 395. Although we do not embrace that court's prospective/retrospective effect analysis, we do agree that the district court had jurisdiction.
 
 
 8
 We have previously set out and discussed the present and former statutory schemes governing judicial review of ICC orders, Alcoa, supra, 553 F.2d at 1269-70, the essential difference between them being that before the present scheme was enacted in 1975, the jurisdiction presently with the courts of appeals resided with three-judge district courts, from which appeals were to proceed directly to the Supreme Court. See United States v. ICC, 337 U.S. 426, 442, 69 S.Ct. 1410, 1419, 93 L.Ed. 1451 (1949). Under both schemes, single-judge district courts were vested with jurisdiction to review ICC orders "for the payment of money or the collection of fines, penalties or forfeitures," which, it seems, "are not of sufficient public importance to justify the accelerated judicial review procedure." United States v. ICC, supra, 337 U.S. at 442, 69 S.Ct. at 1419. As we noted in Alcoa, "(u)nlike other ICC orders, payment orders are not 'quasi legislative orders, in which the public at large are interested....' Rather, they 'affect only the rights of private individuals, have no binding force and do not subject anyone to punishment for disobedience.' " Alcoa, supra, 553 F.2d at 1270 (citations omitted). Thus, Commission orders granting or denying reparations should be reviewed in a single-judge district court. United States v. ICC, supra; Alcoa, supra.
 
 
 9
 We recognize that disputes over freight charges ordinarily bring into question only the lawfulness of particular rates or the interpretation of the tariff under which the carriers justify their collection and retention of the disputed charge.[2] In contrast, Genstar has vigorously contested the validity of the master and update tariffs in this case and has, by arguing that a full 14% refund is the inevitable arithmetical consequence of an invalidation of those tariffs, challenged the fundamental remedial powers of the Commission. Nonetheless, the order at issue directly affects only the rights and obligations of Genstar and the appellant railroads and has no binding force on anyone not a party to the controversy. A decision in this case can affect parties to future reparations proceedings only indirectly-by force of precedent. In this regard, we find ourselves in agreement with the district court: any public interest in the Commission order or in a ruling in this case that exists only because of their value as precedent is not the sort of "widespread interest" to which the Supreme Court was referring in United States v. ICC. See Genstar, supra, 491 F.Supp. at 395. We therefore hold that the district court correctly asserted jurisdiction. Accordingly, we must dismiss the petition for direct review. Alcoa, supra. We reach the merits of this controversy on appeal from the court below.
 
 III. THE MERITS
 
 10
 Genstar argues that its right to recover the full 14% stems not from the establishment of unlawful rates but from the unlawful publication of tariffs. According to Genstar, unlawfully published tariffs can never serve to increase a transportation rate. The initial blanket tariff, which escalated all rates to which it referred by 14%, was published on 15 rather than 30-days notice. Genstar argues that the authorization to file with 15-days notice was inoperative because the railroads actually raised the rates on Canadian traffic 14% rather than the approved 12%. The update tariffs did not "plainly state the changes proposed to be made in the schedule then in force" as required by 49 U.S.C. § 6(3) (now revised in 49 U.S.C. § 10762); nor did the update tariffs contain the appropriate symbols (required by agency regulation) or in any other way indicate the nature of the rate change. Genstar thus asserts that it was deprived of a meaningful opportunity to examine and oppose the proposed rates before they became effective.
 
 
 11
 The Supreme Court long ago rejected the view that a tariff on file with the Commission and never rejected by it should be disregarded or treated as nonexistent merely because of some element of substantive unlawfulness in the rate, Davis v. Portland Seed Co., 264 U.S. 403, 44 S.Ct. 380, 68 L.Ed. 762 (1924), or some irregularity in the tariff filing formalities, Berwind-White Coal Mining Co. v. Chicago & E.R., 235 U.S. 371, 35 S.Ct. 131, 59 L.Ed. 275 (1914). The principle in these cases is that where the shipper has been charged no more than the rate reflected in the tariff on file, the remedy for any unlawfulness or irregularity is measured not by looking to some other tariff but by the harm, if any, caused by the unlawfulness or irregularity. Further, as Genstar concedes, the Commission has had a longstanding policy that even where a tariff is filed without strict compliance with the provisions for tariff filing, the Act does not compel a refund of all charges collected under the tariff. See, e.g., Ralston Purina Co. v. Atlantic B.&C.R., 174 I.C.C. 722 (1931); Concrete Engineering Co. v. Baltimore & O.R., 160 I.C.C. 675 (1930); Southern Transportation Co. v. Norfolk & W. Ry., 147 I.C.C. 29 (1928); Greene Cananea Copper Co. v. Chicago, R.I. & P. Ry., 88 I.C.C. 225 (1924). The Commission in these cases repeatedly rejected arguments that a filed tariff should be treated as nonexistent because it was inconsistent with a Commission limiting order, although the Commission has, where appropriate, awarded a recovery for any harm suffered by the shipper because of the violation.
 
 
 12
 We also agree with the Commission that the defect, if any, in increasing the rates on less than 30-days notice was essentially harmless. The purpose of the 30-day provision is to allow shippers to examine the rate increases and, if thought to be unlawful, to petition the Commission to suspend and investigate the proposed rates. In this case, on a request by the railroads, the Commission had already investigated and determined that a 12% increase on import-export traffic was reasonable. The Commission, after finding good cause to relax the requirement, authorized the railroads to give only 15-days notice before increasing the rates. See 49 U.S.C. § 11762(d)(1). Although the railroads raised the rates on Canadian traffic 14% rather than the approved 12%, we think that the Commission authorization was nonetheless sufficient to dispense with the 30-day requirement. If we were to adopt Genstar's position, then any tariff that the Commission allows to be published with less than 30-days notice would have to be in perfect compliance with the Commission's order or else a nullity. That would be a harsh rule, especially in a case such as the one before us where the "error" in the tariff was certainly not apparent on its face: it took substantial time and litigation before the ambiguities in the Ex Parte No. 267 decision were resolved. Further, common sense and a straightforward reading of the Act, see note 1 supra, suggest that when a carrier effects a rate increase on less than the notice period, the appropriate remedy would be to refund the charges collected during what should have been the notice period, not to treat the tariff as nonexistent. Regarding the update tariffs, Commission policy has always been that rate increases published without the proper flagging symbols were nevertheless valid. See Ex Parte 270, Tariff Improvement, 1980 Fed.Carr.Cas. P 36,932. Since deciding Genstar's complaint, the Commission has announced a stricter policy and adopted rules under which the Commission may order a refund of all charges collected pursuant to an improperly symbolized tariff, see id. at 47663-65, but even if the new rules had been applicable in this case, they would not compel the result sought by Genstar.
 
 
 13
 The only substantial case in support of Genstar's position is Chicago, M., St. P. & P. R. v. Alouette Peat Products, 253 F.2d 449 (9th Cir. 1957). See also Axinn & Sons Lumber Co. v. Long Island R.R., 466 F.Supp. 993 (E.D.N.Y.1978) (citing Alouette Peat as controlling). The Alouette Peat decision, however, primarily addressed the issue of liability rather than the measure of damages (the Commission had declined to make any award even though the tariff rate charged admittedly exceeded the maximum amount specified in the Commission order authorizing the increase). Further, the Commission order in that case apparently did not suffer from the ambiguity inherent in the Ex Parte 267 definition of import-export traffic. To the extent Alouette Peat can be read to support the result sought by Genstar, we are persuaded that we should not follow it in the face of contrary Supreme Court decisions, Commission precedent, and common sense.[3]
 
 
 14
 In summary, then, the Commission's award of 2% is consistent with the Act, which provides not for penalties but for compensation for actual harm, and with longstanding judicial and administrative precedent. The 14% award sought by Genstar bears no relation to the actual harm done and would impose a significant penalty on the railroads, a penalty unwarranted because of the ambiguity in the original Commission order. The construction and administration of the Act and the application of remedies are matters appropriately informed by Commission expertise, and this case involves only the question of appropriate remedy where a tariff is filed, accepted by the Commission, placed into effect without objection, and only later found to violate some statute, rule, or order. Nothing in the Act compels the result urged by Genstar, and adopting Alouette Peat would deny the Commission its authority to fashion appropriate relief in light of the policies underlying the Interstate Commerce Act. For these reasons, we reverse the judgment of the court below.
 
 
 15
 Reversed.
 
 
 
 *
 Of the United States Court of Appeals for the Fifth Circuit, sitting by designation pursuant to 28 U.S.C. § 294(d) (1976)
 
 
 [1]
 49 U.S.C. § 6(3) then provided: "No change shall be made in the rates, fares, and charges ... which have been filed and published by any common carrier in compliance with the requirements of this section, except after thirty days' notice to the Commission and to the public published as aforesaid. ... Provided, That the Commission may, in its discretion and for good cause shown, allow changes upon less than the notice herein specified...."
 The Revised Interstate Commerce Act now provides: "In the case of a rail carrier, a proposed rate change resulting in an increased rate or a new rate shall not become effective for 20 days after the notice is published...." 49 U.S.C. § 10762(c)(3), and "(t)he Commission may reduce the notice period ... if cause exists." 49 U.S.C. § 10762(d)(1).
 
 
 [2]
 In Alcoa, for example, there was no apparent dispute over which of several tariffs governed the shipments at issue. The question in Alcoa was one of tariff interpretation: whether the railroad had, in accordance with the terms of the governing tariff, properly assessed and collected charges on certain rail car shipments. 553 F.2d at 1268-69
 
 
 [3]
 Even if we were to follow Alouette Peat and consider the blanket and update tariffs void, so that this case would in essence involve nothing more than a claim for overcharges, we think the Commission would be free to fashion an appropriate remedy. Genstar finds support for an absolute rule of recovery in Alouette Peat and Axinn. In both cases, the courts assumed that equitable considerations were irrelevant and awarded the full amount of the overcharge. Also, in Moss v. CAB, 521 F.2d 298 (D.C.Cir.1975), cert. denied sub nom Roberts v. CAB, 424 U.S. 966, 96 S.Ct. 1460, 47 L.Ed.2d 732 (1976), where we denied a nonstatutory recovery of unlawful air passenger fares in excess of the last lawfully established rates, we recognized a distinction between the claim for restitution in Moss and the statutory claim for overcharges in Alouette Peat, stating:
 Alouette is distinguishable as a case in which the full amount of a rate increase was restored, even though at least part of that increase appeared just and reasonable, because increased rates were not properly on file with the Commission. We have not discussed the matter of "overcharges," or charges in excess of properly filed rates. Manifestly, the case for a strict rule of recovery is far stronger in that case.
 521 F.2d at 307 (citations omitted). Further, we are mindful of the rule that the Commission has no statutory authority, in rejecting a tariff, to implement a different one. Trans Alaska Pipeline Cases, 436 U.S. 631, 651-54, 98 S.Ct. 2053, 2065-66, 56 L.Ed.2d 591 (1978); United States v. Chesapeake & Ohio Ry., 426 U.S. 500, 511-15, 96 S.Ct. 2318, 2324-26, 49 L.Ed.2d 14 (1977). We nonetheless think it would make little sense for Congress to vest in the Commission the power to fashion and provide complete relief in light of the statutory purposes, and yet allow the Commission absolutely no discretion when ordering a refund of overcharges, particularly where the award may substantially affect the future rates, performance, and health of the industry. Cf., ICC v. B & T Transportation Co., 613 F.2d 1182, 1186 n.6 (1st Cir. 1980) (holding that district court has full range of power to determine what overcharge remedy, if any, is appropriate).