661 F.2d 964
 213 U.S.App.D.C. 52
 BURLINGTON NORTHERN INC., and Louisville & Nashville
Railroad Company, Petitioners,
v.
The UNITED STATES of America and the Interstate Commerce
Commission, Respondents,
Anaconda Company, Intervenor.
 No. 79-2517.
 United States Court of Appeals, District of Columbia Circuit.
 Argued Feb. 3, 1981.
Decided Aug. 20, 1981.
 
 Petition for Review of an Order of the Interstate Commerce commission.
 John Will Ongman, Washington, D. C., with whom R. Eden Martin, Washington, D. C., and Curtis H. Berg were on the brief for petitioners.
 H. Glenn Scammel, Atty. I. C. C., Washington, D. C., with whom Richard A. Allen, Gen. Counsel, Henri F. Rush, Associate Gen. Counsel I. C. C., Sanford M. Litback, Asst. Atty. Gen., Barry Grossman and J. Mark Manner, Attys., Dept. of Justice, Washington, D. C., were on the brief for respondents. David Popowski, Atty., I. C. C., John J. Powers, III, and Robert Lewis Thompson, Attys. Dept. of Justice, Washington, D. C., also entered appearances for respondents.
 Dickson R. Loos, Washington, D. C., with whom David H. Baker, Washington, D. C., was on the brief for intervenor.
 Before JOHN W. PECK*, Senior Circuit Judge for the United States Court of Appeals for the Sixth Circuit, MacKINNON and WILKEY, Circuit Judges.
 Opinion for the Court filed by Circuit Judge MacKINNON.
 MacKINNON, Circuit Judge:
 
 
 1
 Upon complaint of the Anaconda Company, Review Board Number Four of the Interstate Commerce Commission (ICC) reduced the rail rate for shipping aluminum ingots from Conkelley, Montana to Terre Haute, Indiana ("the Terre Haute route"). In prescribing a lower rate to Terre Haute the Board relied upon the rate that the defendant railroads were charging another aluminum company for shipping the same product over a longer, overlapping route. Because the Board failed to show that the rate for the longer route provided a proper measure of the reasonableness of the Terre Haute rate, and failed to consider the full ramifications of a rate reduction, we vacate its decision and remand for further proceedings. We affirm other aspects of the Board's decision and find it unnecessary at this time to address the railroads' contention that the decision must be vacated in any event in light of the intervening enactment of the Staggers Act. We leave the initial application of that Act to the Commission.
 
 I. BACKGROUND
 
 2
 Anaconda produces aluminum ingots from alumina at its smelter at Conkelley, Montana. Most of Anaconda's alumina is shipped by water from the Caribbean island of Jamaica to the port of Everett, Washington, and then shipped by rail to Conkelley. The aluminum ingots produced at Conkelley are transported by rail to Anaconda's aluminum rolling mill in Terre Haute, Indiana, where they are fabricated into mill products such as aluminum sheet and foil.
 
 
 3
 The ingots are transported by the Burlington Northern Railroad from Conkelley to Chicago, and by the Louisville & Nashville Railroad from Chicago to Terre Haute. These carriers also transport aluminum ingots of the Martin Marietta Aluminum Company from Cliffs, Washington to Lewisport, Kentucky (the "Lewisport route"). The Lewisport route runs over much of the same track as the Terre Haute route, but is longer at both ends (a total of 2448 miles as compared with 1757 miles).
 
 
 4
 In September 1978, Anaconda filed a shipper's complaint with the ICC, seeking a 38.8 percent reduction in the rate of $52.76 per ton charged by the railroads for shipping aluminum ingots to Terre Haute. One of Anaconda's allegations was that the rate was unreasonably high, in violation of the Revised Interstate Commerce Act.[1] Before the Commission can reduce a rate for being unreasonably high there must be a showing that the railroad has "market dominance" over the traffic in question. 49 U.S.C. § 10709.[2] The Administrative Law Judge (ALJ) noted that "defendants do not contest the allegations (concerning) their market dominance, and, in fact, confirm it by their submission of cost evidence which reveals that their revenues from complainant's traffic exceed 200 percent of their variable costs."[3]
 
 
 5
 Although finding for Anaconda on the threshold issue of market dominance, the ALJ held the railroads' $52.76 rate was not unreasonably high. Anaconda had urged the ALJ to rely on a comparison between the $52.76 rate for shipping aluminum ingot over the 1757 miles of the Terre Haute route with the $48.60 rate the same railroads charged for shipping the same product over the 2448 miles of the overlapping Lewisport route. The ALJ declined to rule that the Terre Haute rate was unreasonably high, however, apparently because the seeming anomalous disparity between the rates had resulted from a series of general rate increases authorized by the Commission but not fully implemented by railroads in each of the rate territories concerned.[4] The railroads in the territories covering the Terre Haute route had consistently taken advantage of all the authorized increases, but the railroads in the Southern Territory, in which Lewisport is located, had occasionally waived their entitlement to the rate increase.[5] The ALJ did rule for Anaconda, however, on an independent ground: the disparate rate structure created an undue preference in behalf of the Martin Marietta Aluminum Company of Cliffs, Washington.[6] Both sides appealed the decision to the Commission.
 
 
 6
 In October 1979, the Commission's Review Board Number Four overruled two conclusions of the ALJ.[7] In one instance the Board ruled in favor of the railroads, dismissing Anaconda's claim of undue preference.[8] The other ruling, in favor of Anaconda, is the subject of this appeal. The Review Board affirmed without discussion the ALJ's finding of market dominance, but rejected his conclusion that the $52.76 rate, Conkelley to Terre Haute, was not unreasonably high.
 
 
 7
 The basis for the Board's holding was set forth in some detail. The Board explained that in determining whether a rate for shipping a given commodity over a given route is unreasonably high one should consider (1) the ratio of the revenue generated by the rate to the variable cost of moving the relevant commodity over the relevant route,[9] (2) the value of the commodity, (3) rate comparisons, (4) rail revenue need, and (5) the effect of a rate reduction on the transcontinental freight rate structure.
 
 
 8
 The Board observed first that the railroads'
 
 
 9
 revenue-to-variable cost ratio of 250 percent (218 percent at the revenue need level) is a high ratio. However, the Commission has long held that costs alone do not determine the maximum limits in ratemaking and that rates which exceed even fully allocated costs by substantial margins do not necessarily exceed maximum reasonable rate levels solely by reason of that fact. Fibreboard or Pulpboard, Montana to California, 357 I.C.C. 211, 217 (1977). Furthermore, rates resulting in revenue-to-variable cost ratios greater than 200 percent have been approved in several cases. See, Agrico Chemical Co. v. Seaboard Coast Line R. Co., 361 I.C.C. 333, (1979) and the cases cited therein. Therefore, we must look at other factors to determine if the rate is unreasonable.[10]
 
 
 10
 Three of the other four factors the Board considered relevant were either neutral or supported maintenance of the railroads' rate level. First, in relation to the value of the commodity (aluminum ingots), the Terre Haute rate from 1973 to 1977 had decreased from 6.1% of the selling price to 4.7%. The Board called the value of the commodity "important because differential pricing requires some commodities to carry higher rates than others."[11] The increase in the commodity's value in terms of the transportation cost "indicate(d) that aluminum may be better able to bear a high burden than would many other commodities and still move. However, the rate comparison, discussed below(,) indicate(s) that in comparison to other movements of ingot(s), the burden is disproportionately high."[12]
 
 
 11
 The other two factors-revenue need of the railroad and the possibility of rate disruption-also would have tended to support a maintenance of the rate level had the evidence borne them out, but the Board held it did not: "The present rate levels exceed fully allocated costs by a very high percentage, even at a revenue cost level"; and a reduction in the Terre Haute rate would not "require a complete adjustment of all Pacific Northwest rates with a corresponding decrease in overall revenues."[13]
 
 
 12
 The last of the remaining factors-rate comparisons-indicated to the Board that the Terre Haute rate was unreasonably high. The Board rejected the railroads' proposal to compare the Terre Haute rate with rates on other movements of aluminum ingots from the Pacific Northwest to Indiana, reasoning that "the routes of movements and carriers used are not necessarily the same, therefore the cost may also differ based on these factors and the greater distance."[14] The Board did find reliable, however, a comparison between the Terre Haute route and the Lewisport route inasmuch as they had a common track and shared other similar transportation characteristics. The Lewisport route was forty percent longer than the Terre Haute route, yet its rate of $48.60 per ton was about eight percent lower. The Board further noted that "(p)rior to the varying (general) percentage increases, the rates from Conkelley (to Terre Haute) were approximately $3.59 per net ton (13 percent) lower than those from Cliffs (to Lewisport)."[15]
 
 
 13
 The Board then decided that, "(w)eighing these various factors, ... a rate not to exceed $42.41 per net ton ... represents the maximum level of reasonableness."[16] The Commission prescribed this rate on the grounds that it would yield a reasonable rate of return and that it would "also correspond with the rate relationship which existed between the Conkelley-Terre Haute and Cliffs-Lewisport movements before the application of varying percentage increases when the assailed rates were 13 percent lower."[17]
 
 
 14
 While reviewing the ALJ's opinion on the separate issue of whether the Terre Haute rate was unduly preferential, the Board reviewed the railroads' criticism of the rate comparison. The railroads had argued that differing territorial applications of the general rate increases were based on "different circumstances and conditions of the various carriers, including their revenue needs and costs of operation, as well as the competitive forces they faced."[18] The Board reasoned that varying percentage increases are not differences in transportation conditions justifying a rate disparity inasmuch as those variances reflect general transportation conditions and "(i)t is the transportation characteristics of the particular movements which are relevant."[19]
 
 
 15
 Subsequent to the Board's decision, Congress passed and the President signed the Staggers Act, Pub.L.No. 96-448, 94 Stat. 1895 (1980), which narrows the scope of federal regulation of the railroad industry. Prior to the Staggers Act, the Commission permitted a shipper alleging unreasonably high rates to meet its threshold burden of proving the carrier's market dominance by relying on a rebuttable presumption of market dominance, which was triggered by a showing of a 160 percent revenue-variable cost ratio, a 70 percent market share, or a substantial investment. Among the changes wrought by the Staggers Act was a removal of Commission rate jurisdiction over rates that have a revenue cost ratio of under 160 percent.[20]
 
 
 16
 The railroads in their petition for review argue that the Board's decision lacks reasoned findings, violates its mandate under "the new rule of ratemaking" to consider the need for adequate rail revenue, fails to consider the adverse effect that rate reduction in this case will have on railroad earnings, and must be reversed in any event in light of the intervening passage of the Staggers Act.
 
 II. DISCUSSION
 
 17
 We must sustain the Review Board's finding of an unreasonably high rate if it is rationally based upon substantial evidence, giving due regard to its skill and experience in determining the reasonableness of rates.[21] We set aside the order and remand for the reason that the Board appears to have given inadequate consideration to the full implications of two of the factors on which it appears to have placed material reliance-(1) the comparison between the Terre Haute and Lewisport rates, and (2) the possibility of a general rate disruption seriously affecting railroad revenue.
 
 A. The Rate Comparison
 
 18
 Only two of the factors considered by the ICC-the revenue-cost ratio and the Terre Haute-Lewisport rate comparison-indicated a rate that was unreasonably high, and the Board acknowledged that "rates which exceed even fully allocated costs by substantial margins do not necessarily exceed maximum reasonable rate levels solely by reason of that fact."[22] The Board further revealed its material reliance on the rate comparison by prescribing a new rate based on precisely the same disparity (in terms of percentage) that had existed between the Terre Haute and Lewisport rates prior to the series of general rate increases.[23] The validity of the Board's finding and remedy thus stands or falls with the validity of the rate comparison.
 
 
 19
 The Commission may rely upon comparisons with other rates in determining whether the assailed rate is reasonable.[24] For any rate comparison to have probative value, however, the rates must be comparable. The Commission and reviewing courts have consistently insisted that the complainant, who bears the "onus of establishing the unreasonableness of particular rates,"[25] must lay the predicate for a rate comparison by showing that the rates being compared to the assailed rate apply to routes that involve similar terrain and other transportation conditions affecting cost.[26] Once that predicate is laid, the decided ICC cases suggest (although not unambiguously) that the burden of producing evidence shifts to the carrier, who may seek to show that the compared rate is inappropriate as a benchmark because, for example, it is the result of different competitive conditions.[27] Once its probative value is properly assessed, the rate comparison becomes one of the several factors the Commission may consider in making its finding and prescribing, if necessary, a new rate.
 
 
 20
 The Review Board here used the comparison between the Terre Haute and the Lewisport rates both as a factor to indicate that the Terre Haute rate was unreasonably high and as the basis for its rule-of-thumb prescription of a new rate. In both instances, we conclude, the Board acted arbitrarily and capriciously.
 
 
 21
 There is no doubt but that the claimant, Anaconda, established that the transportation conditions (the factors affecting costs) for the two rates were substantially the same, involving as they did the same commodity and much the same track. This showing established a rebuttable presumption that the rate comparison was a valid indicator of the rate's reasonableness. Indeed, several ICC cases state that a rate is prima facie unreasonable when it exceeds another rate applying to carriage of the same commodity in the same direction over the same track for a greater distance.[28]
 
 
 22
 The question, then, is whether the Board adequately considered the record evidence that the rates were nevertheless not comparable. The Board's expert judgment is entitled to great weight, of course, but we must first be satisfied that its judgment has been applied. We conclude the Board did not give appropriate consideration to the railroads' claim that "competitive forces" made the two rates not truly comparable.
 
 
 23
 Anaconda offered no evidence on this point. The evidence pointed to by the railroads includes the facts (1) that the rate disparity developed as the result of the decision of the Southern Territory railroads to waive totally or partially the general rate increases awarded to the Western and Eastern railroads,[29] (2) that during 1972-77 the movement of primary aluminum pig, slabs, or ingots from the Mountain Pacific to the Official Territory (in which Terre Haute is located) increased by 14 percent while the tonnage moving from that origin to the Southern Territory decreased 32%, despite the relative reduction in the Southern Territory rates,[30] and (3) that Pacific Northwest aluminum companies receive their raw materials by water-rail or water-motor carrier transport and might ship to Southern Territory plants by way of the Panama Canal and the Mississippi and Ohio rivers.[31]
 
 
 24
 This evidence suggests, albeit somewhat tenuously, that the Lewisport rate was depressed for competitive reasons, a circumstance that would undermine the validity of the Terre Haute-Lewisport rate comparison.[32] Although the evidence is obviously circumstantial rather than direct, we do not think it can be ignored or rejected as irrelevant. The evidence may possibly be interpreted consistently with the view that the competitive circumstances surrounding the Terre Haute and Lewisport rates are similar. The Board, however, has not addressed this evidence and advanced that interpretation, and we cannot indulge in the assumption that it would do so without usurping its function. The railroads' competition claim, although not necessarily compelling, left Anaconda, as the party bearing the ultimate burden of persuasion, with the task of rebutting that claim.[33] And the Commission, once the issue of competition is raised, should explain why it finds the rates nonetheless comparable.
 
 
 25
 The railroads' further complaint with the Commission's reliance on the rate comparison is that, assuming some reliance was justified, the Board was arbitrary and capricious in prescribing a maximum reasonable level on the basis of the 13% disparity that had prevailed between the two rates prior to the varying territorial applications of the general rate increases. The railroads contend that where, as here, the Commission is prescribing a new rate on the basis that it represents the maximum reasonable rate, and where, as here, the level prescribed is based on the level of another rate, the prescription is invalid absent a finding the compared rate is itself at the high end of the zone of reasonableness.[34] The railroads cite for that proposition Cargill, Inc. v. Chicago, M., St. P & P. R. Co. : "A comparison of the assailed rate with one other rate is no indication that the former is unreasonable, for it may well be that the latter rate is below a maximum reasonable level instead of the assailed rate being unreasonably high."[35] They also cite the statement of the Supreme Court in Youngstown Sheet & Tube Co. v. United States that rate comparisons are "not a conclusive test of reasonableness of a rate under investigation."[36]
 
 
 26
 The Board did not explain how its reliance upon the Lewisport rate in setting the maximum reasonable level of the Terre Haute rate was reconcilable with the logic of these cases, and we do not find them sufficiently distinguishable to allay our concern that the Commission may have arbitrarily departed from precedent.[37] Justifications for the Boards' determinative reliance on the Lewisport rate may exist,[38] but they do not appear in its decision.
 
 
 27
 The Board on remand should reexamine its use of the rate comparison, both as an indicator of unreasonableness and as a measure of the maximum reasonable Terre Haute rate.
 
 B. Revenue Adequacy Under the Staggers' Act
 
 28
 The railroads also assert the Board's decision contravened the dictates of the "new rule of rulemaking," specifically 49 C.F.R. § 1109.25, which states, "the need for revenue adequacy will be taken into account and regarded as a highly important factor."[39] According to the railroads, the Board ignored the railroads' need for differential pricing. They contend that, in light of the decrease in the Terre Haute rate as a percentage of the selling price of aluminum ingots, this "is the paradigm situation for approval of a rate well in excess of costs to make a contribution to the overall revenue adequacy of the railroads."[40]
 
 
 29
 We do not accept the railroads' contention. The legislation which inaugurated the new rule of ratemaking did not strip the Commission of its power and duty to protect shippers from the unreasonably high rates of carriers with market dominance. Thus, while the need for differential pricing is something the Commission cannot ignore, it is not the only factor the Commission is entitled to evaluate.[41] It may continue to consider the factors it has traditionally examined in determining whether the rate of a carrier with market dominance is unreasonably high. In this case the Commission explicitly evaluated the value of the commodity and the need for differential pricing. See note 11 supra and accompanying text. It prescribed a rate that would return 201% of variable cost at the embedded debt level, and 138% of fully allocated cost at the revenue need level. This latter figure reflects differential pricing. Given the Commission's explicit consideration of the relevant factors and a result that is not clearly unreasonable we cannot say that the Board's action was arbitrary and capricious under the standards applicable to this phase of its considerations.
 
 C. Possible Disruption of Rate Structure
 
 30
 The railroads' final objection to the decision of the Board is that it failed to consider the disruptive effect that a reduction in the Terre Haute rate might have on the railroads' overall earnings.
 
 
 31
 In declining to find assailed rates unreasonably high the Commission has occasionally relied upon its prediction that prescribing a lower rate would disrupt rate structures and undermine the railroads' ability to earn revenue and thus provide services to the shipping public.[42] An inappropriate reduction would have this effect, the Commission has stated, either because the reduction would provoke destructive price competition or because it would lead to successful demands for rate reduction from other complainants in the same transportation group.[43]
 
 
 32
 In their appeal to the Review Board the railroads asserted that
 
 
 33
 Anaconda's rates fit into the established Transcontinental rate structure on aluminum ingots, and granting the relief it seeks here threatens a well established and successful rate structure. The rate reduction Anaconda seeks cannot be confined to Anaconda alone, and as defendants' witness Cobb explains, the cascading effect from granting Anaconda the relief it here seeks would cost the railroads millions of dollars annually.[44]
 
 The Board addressed this concern:
 
 34
 Nor will an adjustment in the Conkelley-Terre Haute rate require a complete adjustment of all Pacific Northwest rates with a corresponding decrease in overall revenues. The rate structure has already been disrupted by the lower combination rates which can be constructed over the Southern Freight Association points from Washington origins. Greater distances are also involved from those origin points which would justify a higher rate. Therefore, we do not find defendants' revenue need arguments persuasive.[45]
 
 
 35
 Read in context, the Board's statement refers to routes originating in Washington and terminating in Indiana and points east. Those were the routes the railroads had unsuccessfully urged as comparable routes. The Board's explanation that the rates for those routes would not be subject to any domino effect emanating from a Terre Haute rate reduction was rational and the railroads do not contend otherwise.
 
 
 36
 The railroads do contend, however, that the Board's consideration of the effects of rate reduction was inadequate insofar as it "totally ignores the disruption which will be caused in the transcontinental freight structure from Pacific Northwest origins to the destinations west of Terre Haute in Western territory."[46] Counsel for the Commission submit that "all" in the Board's phrase "complete adjustment of all Pacific Northwest rates" must include rates restricted to the Western territory.[47] As we have noted, however, the most natural reading of the Board's statement is that only the destinations in the vicinity of Terre Haute were considered.
 
 
 37
 Counsel for Anaconda submit that its plant at Conkelley is the only aluminum smelter in Montana, a fact that makes the Terre Haute rate sui generis. The rates that the railroads brought to the Board's attention all involve aluminum plants situated 500 or more miles to the west of Conkelley. Anaconda suggests that the greater distance and more difficult terrain applicable to routes originating from Pacific Coast states would make the Terre Haute rate a poor candidate for a rate comparison in any proceeding challenging the rates for these routes. Indeed, Anaconda continues, the inherent difference between routes originating in Pacific Coast states and those originating in Montana explains why their respective rates are placed in two different tariffs. Finally, Anaconda contends that the evidence submitted by the railroads on routes ending in the Western Territory was inadequate because only the rate for a minimum of 60,000 pounds per carload was shown whereas the Terre Haute rate in question applies on a minimum weight of 180,000 pounds.
 
 
 38
 However persuasive Anaconda's explanations may be, they are post hoc explanations of counsel and cannot substitute for the agency's own explanation. The Board did not address the possibility of rate disruption as to routes ending west of Terre Haute, although the railroads produced some evidence concerning it. The Board will have an opportunity to supply its explanation as to those rates on remand.
 
 
 39
 In supplemental briefs filed following the enactment of the Staggers Act,[48] the parties have discussed whether it should apply retroactively to this case, which was pending appeal when the Act became law. The railroads argue, among other things, that the Act deprived the Commission of jurisdiction because (1) the ALJ and Board in determining the "market dominance" of the railroads relied exclusively upon the showing that the rate's revenue-variable cost ratio exceeded 160 percent, a showing that triggered a rebuttable presumption of market dominance under 49 C.F.R. § 1109.1(g) (1979) and (2) that regulation was "clearly at odds with the Staggers Act" and has now been repealed. Counsel for the Commission and Anaconda respond that the Act should be applied prospectively only, and that in any event it would not affect the result here.
 
 
 40
 As we have done on other occasions,[49] we decline to address the applicability vel non of the newly-enacted statute, and leave its initial application to the Commission on remand.
 
 
 41
 Judgment accordingly.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 294(d)
 
 
 [1]
 "If the Commission determines, under section 10709 of this title, that a rail carrier has market dominance over the transportation to which a particular rate applies, the rate established by such carrier for such transportation must be reasonable." 49 U.S.C. § 10701a(b)(1). See also id. § 10701(a)
 
 
 [2]
 (a) In this section, "market dominance" means an absence of effective competition from other carriers or modes of transportation for the transportation to which a rate applies
 ....
 (c) When the Commission finds in any proceeding that a rail carrier proposing or defending a rate for transportation has market dominance over the transportation to which the rate applies, it may then determine that rate to be unreasonable if it exceeds a reasonable maximum for that transportation.
 49 U.S.C. § 10709(a), (c).
 
 
 [3]
 Initial Decision, Joint Appendix (JA) 205
 
 
 [4]
 Supra note 3, JA 206-07, 209
 
 
 [5]
 See note 15 infra
 The Southern Freight Association ("SFA" or "Southern") Territory is bounded on the west and northwest by the Mississippi and Ohio rivers. Terre Haute, Indiana is in the Eastern, or Official, Territory, which is bounded on the west by the Illinois-Indiana border and on the southwest by the Ohio river. Both the Terre Haute and the Lewisport routes proceed from the Pacific Northwest through the Western Trunk Line Territory, an area that includes all or parts of Nebraska, the Dakotas, Minnesota, Iowa, and Wisconsin.
 
 
 [6]
 JA 207-08. The ALJ also ruled that the Terre Haute rate did not constitute a violation of the long-and-short-haul provisions of the Act, that maintenance of the rate disparity was not prohibited unjust discrimination, and that the undue and unreasonable rate preference that was found had not been established willfully or knowingly. JA 209
 
 
 [7]
 Anaconda Co. v. Burlington Northern, Inc., No. 37028 (October 25, 1979), JA 262-69
 
 
 [8]
 Supra note 7, JA 267-68. Anaconda has not petitioned for review of this ruling and we do not address it
 
 
 [9]
 Variable costs, once referred to as "out-of-pocket costs," are costs that vary with volume of traffic or output over a relatively long-run period. They include operating expenses, rents, and a provision for the cost of capital on the variable portion of the rail investment. See Rules to Govern the Assembling and Presenting of Cost Evidence, 337 I.C.C. 298, 308, 324, 326 (1970); Railroad Petitioners' Brief at 13
 
 
 [10]
 The source of the figures cited by the Commission is the table below. We have added to the Commission's table the figures that reflect the rate of $42.41 per ton that it ultimately prescribed
 REVENUE-COST RATIOS
 Embedded Revenue
Rate per ton Cost Level Debt Need Level
-----------------------------------------------
$52.76 variable 250% 218%
 fully 197 171
 allocated
Prescribed
 by ALJ: variable 214 186
$45.01 fully 168 146
 allocated
Requested by
 Anaconda: variable 153 133
$32.27 fully 120 105
 allocated
Prescribed
 by ICC: variable 201 175
$42.41 fully 158 138
 allocated
 Supra note 7, JA 264.
 Some of these terms may bear elaboration. Variable costs we have mentioned. Note 9 supra. Costs at the "embedded debt level" take into account the cost of debt capital but not the cost of equity capital. Costs at a "revenue need level" impute interest to equity capital, i. e., treat return on investment as an element of cost. See Rules for Cost, supra note 9, 337 I.C.C. at 325, 331-32. "Fully allocated costs," finally, which were once called "fully distributed costs," are all costs, both variable and constant, equitably apportioned to the movement of traffic to which the rate in question applies. See id. at 325. Constant costs are those relatively fixed expenses which are not affected by relatively short-run changes in volume of traffic or output, i. e., which continue irrespective of such changes. Id. at 330.
 A revenue-variable cost ratio indicates whether a route is "paying for itself," whereas a ratio of revenue to fully allocated cost indicates whether the rate is earning its full share of the total revenue needed to compensate for overall costs. See id. at 333.
 
 
 [11]
 Supra note 7, JA 265. Differential pricing occurs when a seller charges different customers different prices based upon their demand for the product and thus reaps a larger profit (or smaller loss) from some sales than from others. As Judge Leventhal explained in Houston Lighting & Power Co. v. U. S., 606 F.2d 1131, 1148 (D.C.Cir.1979):
 The Commission concluded that (49 U.S.C.) § 10704(a)(2)'s command permits some rates to be set at a level exceeding fully allocated costs in order to compensate for those rates which must be set at less than fully allocated costs to meet competition from other transport modes. This was neither arbitrary nor forbidden by the Act. It is pertinent to the objective of providing an adequate overall level of earnings. If traffic with a high value of service is viewed in isolation it bears a heavy burden. Yet all shippers ultimately benefit when the rail carriers are able to generate revenues needed for survival.
 
 
 [12]
 Supra note 7, JA 265
 
 
 [13]
 Supra note 7, JA 265
 
 
 [14]
 Id. at 265
 
 
 [15]
 Id. at 266. From November 1968 to June 1978 the Terre Haute and Lewisport rates were made eligible for 17 general increases. Below in tabular form are some representative increases, including the four general increases that affected the two rates disparately
 Difference
 Conkelley- Cliffs- Between Lewisport
 Terre Haute (% Lewisport (% and Terre
Ex Parte No. Rate increas- Rate increase) Haute Rates
 e)
-------------------------------------------------------------------------------
(11-27-68) $22.55 per ton 25.86 3.31
X-267-B 29.80 (12) 32.34 (6) 2.54
(4-12-71)
X-305-A 34.92 (3.3) 37.89 (3.3) 2.97
(6-20-74)
X-305-A 38.41 (10) 37.89 (waived) --0.52
(6-20-74)
X-310-A 41.10 (7) 40.54 (7) --0.56
(4-27-75)
X-313 43.16 (5) 40.54 (waived) --2.62
(6-20-75)
X-343 50.73 (5) 47.65 (5) --3.08
(11-30-77)
X-349 52.76 (4) 48.60 (2) --4.16
(6-17-78)
 See JA 43-44, 82-83.
 
 
 [16]
 Supra note 7, JA 266
 
 
 [17]
 Id. at 267
 
 
 [18]
 Id. at 268, alluding to Defendants' Appeal of Initial Decision at 6, JA 217. Although raised in the context of the undue preference issue, the railroads' claim relates to the reasonableness issue as well. See note 27 infra and accompanying text
 
 
 [19]
 Id
 
 
 [20]
 49 U.S.C. § 10709(d)(2)
 
 
 [21]
 E. g., ICC v. New York, New Haven & Hartford RR., 372 U.S. 744, 761-64, 83 S.Ct. 1038, 1049-50, 10 L.Ed.2d 108 (1963); Burlington Truck Lines v. United States, 371 U.S. 156, 167-68, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962); Burlington Northern, Inc. v. United States, 549 F.2d 83, 87, 88 (8th Cir. 1977)
 
 
 [22]
 Supra note 7, JA 264
 
 
 [23]
 See TAN 17 supra
 
 
 [24]
 Comparisons of other rates in the same or adjacent territory, while not a conclusive test of reasonableness of a rate under investigation, have probative value
 Youngstown Sheet & Tube Co. v. United States, 295 U.S. 476, 480, 55 S.Ct. 822, 824, 79 L.Ed. 1553 (1935).
 
 
 [25]
 New England Grain & Feed Council v. ICC, 598 F.2d 281, 284 (D.C.Cir.1979)
 
 
 [26]
 Aluminum Company of America v. ICC, 581 F.2d 1004, 1008 (D.C.Cir.1978)
 
 
 [27]
 See J. Guandolo, Transportation Law 483-84 (3d ed. 1979):
 the prima facie presumption that rates to intermediate point(s) which exceed the corresponding rates to more distant points over the same routes are unreasonable may be rebutted by a showing that the rate differences are warranted by differences in competitive conditions; rates depressed to meet compelling competitive conditions are an improper standard by which to determine the reasonableness of rates under attack; and compared rates depressed by reason of the competition of another mode of transportation are not an appropriate standard with which to measure maximum reasonableness of assailed rates not shown to be affected by such competition.
 (footnotes omitted).
 Some ICC cases can be read to place the burden of production as to comparable competitive circumstances on the complainant. E. g., National Elec. Mfrs. Ass'n v. Aberdeen & R.R. Co., 349 I.C.C. 502, 513-14 (1974) (complainants' allegation of unreasonably high rate was "totally unconvincing because the factual record as made (1) fails to demonstrate that the compared commodities possess the same general transportation characteristics as complainants' ..., and (2) further fails to set forth the factual or competitive conditions under which the rates on the compared traffic were established versus the assailed noncompetitive rates applicable on the complainants' 100-percent captive traffic"), aff'd in relevant part sub nom. National Elec. Mfrs. Ass'n v. U. S., 407 F.Supp. 598 (W.D.Pa.1976).
 Other cases place the burden upon the defendant railroad, e. g., Apache Powder Co. v. Atchison, T. & S. F. Ry. Co., 299 I.C.C. 649, 651 (1957) ("The mere declaration of defendants that rates are depressed (because of competition) is of no probative value unless supported by persuasive evidence.").
 Thus, while the ICC practice appears to be that the railroad-defendants have the burden of proceeding (and perhaps of proof, also) on the question whether competitively depressed rates invalidate a proferred rate comparison, the Commission has not articulated a definite position.
 
 
 [28]
 Lynchburg Traffic Bureau v. Smith's Transfer Corp., 310 I.C.C. 503, 506 (1960); Magnet Cove Barum Corp. v. Chicago, B & Q R. Co., 301 I.C.C. 13, 18 (1957). Accord, J. Guandolo, Transportation Law, supra note 27
 
 
 [29]
 The Southern railroads' decision to forgo available rate increases has consistently been based, in part, on an assessment of competitive factors affecting southern traffic. In connection with Ex Parte No. 267, see note 15 supra, the Commission noted that "(t)he selective increase proposal which the Southern carriers desire to employ is the product of a study of their particular traffic conditions and competitive problems. We recognize it as a legitimate exercise of managerial discretion ...." Increased Freight Rates, 1970 and 1971, 339 I.C.C. 125, 135 (1971), quoted in Defendants' Appeal of Initial Decision at 6, JA 217. A similar recognition of the differing competitive circumstances among the respective territories has been cited to justify other decisions by Southern carriers to forgo higher rate increases. E. g., Increase Freight Rates and Changes, 1973, Nationwide, 344 I.C.C. 589, 660 (1973); Increased Freight Rates, 329 I.C.C. 854, 879, 893, 942 (1967). The relatively lower rates accepted by the Southern carriers is thus some evidence that the Lewisport rate, directly affected by those waivers, was depressed for competitive reasons
 
 
 [30]
 That rail shipments of aluminum to Southern Territory were decreasing while shipments to Official Territory were increasing is a fact that, absent explanation, indicates a need to keep rates in the Southern Territory relatively lower to attract or retain business
 
 
 [31]
 The reliance of Pacific Northwest aluminum companies on intermodal transport to obtain their raw materials from the Carribean is logically probative of the existence of potential intermodal transport of aluminum between the Pacific Northwest and the Southern Territory. It was pointed out at oral argument that Anaconda had stated, "we have no viable competitive modes available to us." Transcript of Oral Argument at 12. The relevant concern here, however, is not the competitive modes available to Anaconda, on the Terre Haute route, but the competitive modes available to an aluminum company shipping by rail via the Lewisport route. Given that there are no competitive modes available to Anaconda, the availability of any competitive mode to an aluminum company shipping to Lewisport is a factor depressing the rate on the Lewisport route vis-a-vis that on the Terre Haute route
 
 
 [32]
 E. g., Atlantic Creosoting Co. v. Southern Ry., 323 I.C.C. 533, 538 (1964) ("We have repeatedly stated that rates depressed to meet competition do not afford a reasonable standard with which to measure the maximum reasonableness of rates."). Of course, the fact that the allegedly depressed Lewisport rate in nominal terms actually increased during the period in question is of no intrinsic significance. While the Lewisport rate rose by 88 percent in the period 1968-78, rail costs increased by over 147 percent. (H.R.Rep.No. 96-1035, 96th Cong., 2d Sess. 106 (1980) U.S.Code Cong. & Admin.News 1980, p. 3978)
 
 
 [33]
 A further difficulty with this case, of course, is that the ICC has not clearly and definitely explained whether competitive circumstances belong in the category of transportation conditions, the similarity of which the shipper must prove, or in a separate category of factors which, for various reasons, it is the carrier's duty to show. See note 27 supra
 
 
 [34]
 Indeed, given that "previously-promulgated rates bear a presumption of regularity," New England Grain & Feed v. ICC, 598 F.2d 281, 285 (D.C.Cir.1979), and that increases authorized for the Lewisport rate did not go into effect only because the Southern railroads waived the increase, there is reason to presume that the $48.60 Lewisport rate was below the maximum level of reasonableness
 
 
 [35]
 292 I.C.C. 198, 200 (1954)
 
 
 [36]
 Supra note 24, 295 U.S. at 480, 55 S.Ct. at 824 (emphasis added)
 
 
 [37]
 See Secretary of Agriculture v. United States, 347 U.S. 645, 653, 74 S.Ct. 826, 831, 98 L.Ed. 1015 (order must be set aside where Commission has not "adequately explained its departure from prior norms and has not sufficiently spelled out the legal basis of its decision"); cf. New England Grain & Feed v. ICC, 598 F.2d 281, 285-86 (D.C.Cir.1979) (ignored precedent sufficiently distinguishable)
 
 
 [38]
 A possible basis for reliance upon the Lewisport rate and the preexisting rate differential to prescribe the Terre Haute rate is the doctrine of "relative unreasonableness." The extent to which the Commission recognizes the doctrine is not clear. Compare Sterling Colo. Beef Co. v. Atchison, T. & S.F. Ry. Co., 339 I.C.C. 530, 536 (1971); Port of New York Auth. v. Aberdeen & R.R. Co., 321 I.C.C. 738, 746 (1964) Lake-Cargo Coal From Kentucky, Tennessee, Virginia & West Virginia to Lake Erie Ports, 139 I.C.C. 367, 386 (1928) (relying on relative reasonableness) with Southeastern Ass'n of R. & Util. Comm'rs v. Atchison, T. & S.F. Ry., 321 I.C.C. 519, 545 (1964); Cargill, Inc. v. Chicago, M., St. P. & P. R. Co., 292 I.C.C. 198, 200 (1954) (criticizing notion of relative reasonableness when question is whether rates are unjust or unreasonable)
 The concept of relative reasonableness appears to derive from the "just" component of the old ICC Act's requirement that rates be "just and reasonable." According to some authority, just and reasonable are not synonyms. Rather, reasonableness concerns whether the rate is compensatory to the carrier, while justness concerns whether rates are just between shippers. Under this formulation a rate may be just while unreasonable, or reasonable while unjust. The Revised ICC Act drops the use of "just" and uses simply "reasonable." Because the Revised Act was not intended to work any substantive change, however, whatever substantive content inhered in "just" under the old act should now inhere in the term "reasonable" under the Revised Act.
 However the Commission may wish to resolve this question, it is clear that the Board prescribed the level of the new Terre Haute rate solely on the basis that it "represents the maximum level of reasonableness." Note 16 supra. Neither the Commission counsel nor intervenor Anaconda contend that the Board relied on the doctrine of relative reasonableness.
 
 
 [39]
 See also 49 C.F.R. § 1109.25 (1979): "The need for revenue adequacy will be taken into account and regarded as a highly important factor both in general rate increase proceedings and in individual rate proceedings."
 
 
 [40]
 Railroad Petitioners' Brief at 52
 
 
 [41]
 Standards & Procedures for the Establishment of Adequate Railroad Revenue Levels, 359 I.C.C. 270, 273 (1978)
 
 
 [42]
 Chicago, B & Q. R. Co. v. Chicago & E. I. R. Co., 315 I.C.C. 37, 56 (1961) ("If the (proposed rate reductions) were to remain effective, the record is convincing that the railroads could not resist their competitive pressure, with the result that the rate reductions could be expected to spread throughout most or all of both the midwestern and eastern lake-cargo rate structures."); Atchison Board of Trade v. Atchison, T. & S. F. Ry. Co., 305 I.C.C. 637, 650 (1958) ("The proposal of the complainants would have the effect of moving the eastern boundary of the area, taking the same transcontinental rate some 150 miles to the east. The resulting disruption of existing rate relations between adjacent communities would necessarily lead to demands for further revisions in the rates from origins located to the east and would place in jeopardy much of the transcontinental adjustment."); Floersheim Mercantile Co. v. Southern Pacific Co., 278 I.C.C. 359, 363 (1950) ("It is a safe prediction we feel that the proposal here to make a reduction from the western edge of the transcontinental group would inevitably be followed by a request for similar reductions from ... others ... in the same group, from which the rates ... would be higher ... for minor differences in distance much too small to warrant the disparities."); Connor Lbr. & Land Co. v. Ann Arbor R. Co., 220 I.C.C. 648, 654-55 (1937) ("A readjustment of the rates from the single point of origin involved in the instant case would affect the entire rate structure on sawdust to the East from Wisconsin and Upper Michigan, through prejudice and preference necessarily caused at other points.... (S)uch a displacement ought not to be made without a clear showing that the rate assailed was indefensible.")
 
 
 [43]
 Id
 
 
 [44]
 Defendants' Reply to Complainants' Appeal from Initial Decision at 5, JA 258
 
 
 [45]
 Supra note 7, JA 266
 
 
 [46]
 Railroad Petitioners' Brief at 53
 
 
 [47]
 ICC Brief at 19
 
 
 [48]
 See TAN 20
 
 
 [49]
 See, e. g., Carolina Freight Carriers Corp. v. ICC, 627 F.2d 563, 564 n.2 (D.C.Cir.1980); Potomac Elec. Power Co. v. United States, 584 F.2d 1058, 1066-67 (D.C.Cir.1978)